UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re: 6525 BELCREST ROAD, LLC,

　　　　　　　　　　　Debtor,

6525 BELCREST ROAD, LLC,

　　　　　　　　　　　Debtor-Appellant

v.

DEWEY, L.C.,

　　　　　　　　　　　Appellee.

23 Civ. 11205 (DEH)

**OPINION
AND ORDER**

---

DALE E. HO, United States District Judge:

This appeal arises from the bankruptcy proceedings of 6525 Belcrest Road, LLC (the "Debtor-Appellant" or "Belcrest").  Debtor-Appellant Belcrest challenges an order of the United States Bankruptcy Court for the Southern District of New York (Michael E. Wiles, Bankr. J.), granting Dewey, L.C. ("Dewey") an allowed claim of $2,428,675.83 (the "Claim").  For the reasons explained below, the Bankruptcy Court's order is **AFFIRMED**.

## BACKGROUND

The decision of the bankruptcy court sets forth the facts relevant to this matter in detail.  The facts necessary to Belcrest's appeal are summarized briefly below.

Belcrest was the owner of the "Metro III" building in Hyattsville, Maryland.  *See* Bankr. Decision re: Dewey, L.C.'s Proof of Claim ("Bankr. Decision") ¶ 5, ECF No. 1-1.  Belcrest also leased[1] an uncovered vehicular parking lot across the street from the Metro III building (the "Leased Premises"), which Dewey owned.  *See* Br. for Debtor-Appellant ("Appellant's Br.") at 5-6, ECF No. 10; Bankr. Decision ¶ 1.  The agreement between Belcrest and Dewey (the "Lease

---

[1] The Lease Agreement and a subsequent amendment to it, described *infra*, were originally between Dewey and predecessor owners of the Metro III building.  *See* Bankr. Decision ¶¶ 1, 3. But for the sake of simplicity, this Order simply describes Belcrest as the "tenant" in the Lease Agreement.

Agreement") provided that the tenant (*i.e.*, Belcrest), would pay base rent equal to a percentage of the tenant's gross rental income, or no less than $690,000 per year, *id.*, and ran for a term ending June 30, 2045, *see* Appellant's Br. at 5.

Section 6.1 of the Lease Agreement gave Dewey the right to designate "Substitute Lease Premises." Bankr. Decision ¶ 2. An amendment to the Lease Agreement dated July 16, 2014 (the "Ground Lease Amendment") provided that Dewey had the right to designate various locations as "Permanent Substitute Leased Premises" for substitute parking, including two garages known as Parking Garage A and Parking Garage B. *Id.* ¶ 3. At all times relevant to this appeal, Parking Garage A was owned by New Town Parking, LLC ("New Town"), and Parking Garage B was leased by New Town Metro I, LLC ("New Town Metro"); New Town and New Town Metro were, in turn, owned by the Bernstein Companies ("Bernstein"). *Id.* ¶ 4.

At some time in or before 2019, Dewey decided to develop the Leased Premises, and therefore sought to identify substitute parking for Belcrest. *See id.* ¶ 6. On February 14, 2019, Dewey entered into an agreement (the "Assignment Agreement") with New Town, which recited Dewey's desire to transfer to New Town all of Dewey's right, title, and interest in the Lease Agreement with Belcrest, and to designate the top three floors of Parking Garage A as Permanent Substituted Leased Premises pursuant to the Lease. *See id.* ¶ 7. Paragraph 3 of the Assignment Agreement specified that Dewey was required to send an "Exchange Notice" informing Belcrest of the parking substitution before September 30, 2021, and that the effective date of the substitution (the "Transfer Date") would be no earlier than thirty (30) days after the date of the Exchange Notice. *See id.* ¶ 8.

On or about May 5, 2020, Dewey sent Belcrest the Exchange Notice, designating various parking spaces in Parking Garages A and B as Permanent Substituted Leased Premises under the Lease Agreement and stating that the exchange would be effective on November 15, 2020. *See*

*id.* ¶ 13.  Belcrest contested the Notice, and Dewey then commenced arbitration.  *See id.* ¶ 17.

While arbitration was pending, Dewey sent Belcrest two supplemental exchange notices, one of

which postponed the effective date of the substitution to January 18, 2021.  *See* Appellant's Br. at

7.

 In April 2021, Dewey and New Town executed an amendment to the Assignment

Agreement (the "Amended Assignment Agreement").  Bankr. Decision ¶ 35.  The Amended

Assignment Agreement provided for a "Revenue Transfer Date" separate from the Transfer Date

referenced in the original Assignment Agreement.  *Id.* ¶ 37.  Under the Amended Assignment

Agreement, all rents under the Lease Agreement would continue to be paid to Dewey, even after

the original Transfer Date, until a separate "Revenue Transfer Date," which was defined as the

"final, non-appealable approval of the two Detailed Site Plans that will allow [Dewey's]

commencement of infrastructure construction on the Leased Premises."  *Id.*   The parties agree that

the Revenue Transfer Date was August 30, 2022, when approval of Dewey's detailed site plans

for its development project became final and non-appealable.  *See* Appellant's Br. at 16, 22-23;

Br. of Appellee Dewey, L.C. ("Appellee's Br.") at 20-21, ECF No. 11.

 *Arbitration and Related State Court Proceedings.*   During arbitration, Dewey did not

disclose to either the arbitrator or Belcrest that it had entered into an Assignment Agreement with

New Town.  Bankr. Decision ¶ 21.  Dewey also submitted affidavits purporting that Dewey held

a lease agreement with respect to the parking spaces in Garages A and B that Dewey had

designated as substitute parking for Belcrest under the Lease Agreement.  *See id.* ¶¶ 22-29.  But

these statements turned out to be false; in fact, there was no such agreement that gave Dewey rights

to the parking spaces that it offered to Belcrest as substitute parking.  *See* Appellant's Br. at 8-9.

Regardless, on May 18, 2021, the arbitrator issued a decision in Dewey's favor.  *See* Bankr.

Decision ¶ 38.  The arbitrator rejected Belcrest's argument that Dewey had to "prove" its control

over the substitute parking and concluded that, under the terms of the Lease Agreement, it was sufficient that Belcrest be given exclusive access to the substitute parking—and there was no dispute that Belcrest in fact had such access. *Id.* ¶¶ 38-39. The arbitrator entered a final award on August 12, 2021. *See id.* ¶ 47. State court proceedings on the arbitration decision commenced shortly thereafter, and the Maryland state court confirmed the arbitration award and decision on October 5, 2021. *See id.* ¶ 52.

*Bankruptcy Proceedings*. Meanwhile, on May 19, 2021 (one day after the arbitrator's decision), Belcrest filed its Chapter 11 bankruptcy petition. *See id.* ¶ 42. On May 31, 2021, Belcrest sought an injunction that would permit it to continue using the Leased Premises for parking; on June 3, 2021, the bankruptcy court denied Belcrest's request for a TRO, and then after a hearing on June 15, 2021, it denied Belcrest's motion for an injunction. *See id.* ¶¶ 42, 43, 46. On September 9, 2021, Dewey filed a proof of claim. *See id.* ¶ 51. On September 14, 2021 (about a month after the arbitrator entered a final award), Belcrest filed a motion to reject the Lease Agreement, which the bankruptcy court granted on October 4, 2021. *See id.* ¶¶ 47-49. Dewey filed amended proofs of claim on October 5, 2021, and November 2, 2021. *See id.* ¶ 51. The latter was in the amount of $2,724,544.42. *See* Appellee's Br. at 18.

On December 7, 2023, after a full-day trial and submission of proposed findings of fact and conclusions of law, the bankruptcy court issued its decision allowing Dewey's claim in full, offset by certain real estate taxes that Belcrest had paid, for a total of $2,428,675.83. *See* Bankr. Decision at 46-48. This appeal ensued.

## LEGAL STANDARDS

A bankruptcy court's factual findings are accepted unless clearly erroneous, and its legal conclusions are reviewed de novo. *See Argo Fund, Ltd. v. Bd. of Dirs. of Telecom Argentina,*

*S.A.*, 528 F.3d 162, 169 (2d Cir. 2008); *Bondi v. Cap. & Fin. Asset Mgmt. S.A.*, 535 F.3d 87, 91 (2d Cir. 2008).

**DISCUSSION**

Belcrest raises four arguments on appeal, each of which is discussed in turn below. Belcrest's arguments revolve primarily around the notion that Dewey did not have a valid claim under the Lease Agreement (or had a more limited one than the bankruptcy court allowed) because Dewey assigned its rights under the Lease Agreement to New Town (and sought to conceal that fact from Belcrest). Dewey's principal response is that, under the terms of its Amended Assignment Agreement with New Town, Dewey retained the right to collect rents under the Lease Agreement during all relevant times—and Dewey therefore had a valid claim for all unpaid rents under the Lease Agreement. The bankruptcy court agreed with Dewey. This Court perceives no reversible error in the bankruptcy court's analysis and therefore affirms.

**A. Assignment of the Ground Lease**

First, Belcrest argues that "Dewey assigned the Ground Lease to New Town before Belcrest filed its bankruptcy petition and, therefore, [Dewey] lacked statutory and constitutional standing to file any claim." Appellant's Br. at 2-3. According to Belcrest, under the terms of the original Assignment Agreement between Dewey and New Town, all of Dewey's interest in the Lease Agreement was conveyed to New Town as of the Transfer Date, which occurred before Belcrest filed its bankruptcy petition. *See* Appellant's Br. at 23.

But under the terms of the Amended Assignment Agreement between Dewey and New Town, all rents under the Lease Agreement continued to be paid to Dewey until the "Revenue Transfer Date." *See* Bankr. Decision at 30. There is no dispute that that date did not occur until

August 30, 2022,[2] which is well after Belcrest filed its bankruptcy petition (on May 19, 2021) and rejected the Lease (effective on October 1, 2021). The bankruptcy court correctly held that the specific language of the Amended Assignment Agreement, which provided that Dewey retained all rights to rents under the Lease Agreement until the Revenue Transfer Date, "take[s] precedence over any general language in the prior Assignment Agreement and make[s] clear that Dewey still owned the Landlord's rights to receive rent payments from Belcrest" at the time of Belcrest's bankruptcy petition. Bankr. Decision at 30. *See Pinnacle Grp., LLC v. Kelly*, 235 Md. App. 436, 456 (2018) (holding that, under Maryland law, "when a general provision seemingly conflicts with a specific provision, [courts] give effect to the specific provision." (citing *Heist v. Eastern Sav. Bank, FSB*, 165 Md. App. 144, 151, 884 A.2d 1224 (2005))). Accordingly, because Dewey continued to hold the right to collect rents under the Lease Agreement at the time of Belcrest's bankruptcy petition and at the time that Belcrest's rejection of the Lease became effective, Dewey had standing to bring a claim for unpaid rents pursuant to the Lease.

Belcrest devotes much of its Reply brief to arguing that Dewey lacks standing for a lease rejection claim because Dewey no longer met the definition of a landlord under Maryland law by virtue of the terms of its Assignment Agreement with New Town. *See* Reply Br. for Debtor-Appellant ("Reply") at 2-7, ECF No. 12. But there is no real dispute that, under the Amended Assignment Amendment, Dewey continued to hold the landlord's right to collect rent. Accordingly, as the bankruptcy court correctly concluded, Dewey had standing for its claim.

## B. Material Breach of the Ground Lease

Second, Belcrest contends that Dewey "materially breach[ed] the Ground Lease by moving Belcrest's parking to Garages A and B, where [Dewey] had no contractual right to park," and that,

---

[2] *See* Appellant's Br. at 22-23; Appellee's Br. at 20-21.

as a consequence of this breach, "Belcrest is excused from paying rent under the Ground Lease."

Appellant's Br. at 3. The arbitrator considered and rejected this argument, noting that the Lease

Agreement permitted Dewey to designate substitute parking for Belcrest at any time, and contained

no requirement that Dewey have any particular rights with respect to the spaces designated as

substitute parking. *See id.* Joint Ex. 12, at 8. And there is no dispute that parking spaces were in

fact made available to Belcrest, and that Belcrest used them.

In its Reply, Belcrest notes that Dewey fabricated a lease purporting to show that Dewey

in fact had certain rights with respect to the substitute parking that it offered to Belcrest, and

furthermore, that Dewey did not disclose its agreement assigning its interest in the Lease

Agreement to New Town. *See* Reply at 8. This is true but immaterial. The bankruptcy court took

note of these facts, described the conduct of Dewey and its counsel as "improper and inexcusable,"

and referred the matter to the relevant Maryland state bar authorities. Bankr. Decision at 31. But

the bankruptcy court observed, and this Court agrees, that these deceptive and improper litigation

tactics do not establish that Dewey *breached* the Lease Agreement, *see id.*, and Belcrest offers no

cogent argument to the contrary. Accordingly, Belcrest was not excused from paying rent under

the Ground Lease.

### C. Estoppel / Unclean Hands

Third, Belcrest contends that, based on the deceptive and improper behavior described

above, "Dewey should . . . be equitably estopped, or barred by the unclean hands doctrine, from

utilizing the Assignment and Amended Assignment as the basis for its Proof of Claim."

Appellant's Br. at 3-4. As the bankruptcy court explained, while the doctrines of unclean hands

and equitable estoppel are not identical, each requires that "the party who is to be estopped . . .

must have asserted a fact or claim, or made a promise, that a court relied on or that another party

relied on . . . and then later attempted to take a contradictory stance." Bankr. Decision at 32 (quoting *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 395-96 (2d. Cir. 2011)).

Here, Belcrest has not shown that it relied to its detriment on Dewey's false representations about Dewey's purported rights to the substitute parking or on Dewey's failure to disclose its assignment of the Lease to New Town. There is no indication that a court did so either. Rather, the bankruptcy court recognized that Dewey had engaged in improper conduct but held that this did not change the fact that Dewey properly held a lease rejection claim against Belcrest. *See* Bankr. Decision at 35-38; *id.* at 38 ("I have also found that Belcrest was not injured by any of the conduct that allegedly constituted 'unclean hands' on the part of Dewey. Belcrest's counsel agreed at trial that the Court cannot deprive Dewey of a claim simply because Dewey allegedly acted badly . . . .").

Belcrest nevertheless maintains that, had it known about Dewey's assignment of the Lease to New Town, Belcrest could have sought to renegotiate with New Town on more favorable terms or to have sought a modification of the Lease Agreement during bankruptcy proceedings (rather than rejecting it outright). *See* Appellant's Br. at 37. As a legal matter, Belcrest cites no authority for the proposition that Dewey's failure to disclose the Assignment Agreement caused Belcrest prejudice in any way.[3] And as a factual matter, the *hypothetical* possibility of negotiations with New Town is irrelevant—as the bankruptcy court noted, under the terms of the Amendment to the Assignment Agreement, Dewey continued to hold right to receive rents from Belcrest. *See* Bankr. Decision at 36. New Town was not in a position to renegotiate terms, and there is no indication that it would have been receptive to such outreach from Belcrest, as the bankruptcy court found

---

[3] The cases on which Belcrest relies concern lack of timely notice of an insurance claim and of a bankruptcy, and are inapposite. *See* Appellant's Br. at 40 (citing *Matter of Wilbur v. Utica Mut. Co.*, 644 N.Y.S.2d 435 (App. Div. 1996); *In re Rental Car Intermediate Holdings, LLC*, No. 20 Civ. 11247, 2022 WL 2760127, at *13 (Bankr. D. Del. July 14, 2022)).

that the only evidence offered on this point "was self-serving and not credible." *Id.* at 36-37.

Accordingly, because there has been no showing of detrimental reliance by Belcrest on Dewey's

improper conduct, there is no basis for barring Dewey's claim on estoppel or unclean hands

grounds.

### D.  Amount of Claim

Fourth, Belcrest contends that the bankruptcy court erred by not limiting Dewey to its

"actual damages under the Assignment and Amended Assignment," which Belcrest argues consists

of rent during "a period of eleven months" up until the Revenue Transfer date, after which any

rents belonged to New Town, and not to Dewey. *See* Appellant's Br. at 5.

Section 101(5) of the Bankruptcy Code defines a "claim" under the Bankruptcy Code as a

"right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11

U.S.C. § 101(5)(a).  The bankruptcy court explained that a claim under Section 101(5) for lost

rents under a lease includes all future rents as of the bankruptcy petition date, citing cases holding

that the filing of a bankruptcy petition accelerates all of the petitioner's outstanding debts. *See*

Bankr. Decision at 44-45 (citing *HSBC Bank USA, Nat'l Ass'n v. Calpine Corp.*, No. 07 Civ. 3088,

2010 WL 3835200 (S.D.N.Y. Sept. 15, 2010) and *In re Manville Forest Prods. Corp.*, 43 B.R.

293, 297-98 (Bankr. S.D.N.Y. 1984), *aff'd in part, rev'd in part*, 60 B.R. 403 (Bankr. S.D.N.Y.

1986)).  Here, Dewey retained the right to rents under the Lease Agreement as of the date of

Belcrest's bankruptcy petition.  It therefore had a claim as to all future rents under the Lease

Agreement, and the bankruptcy court correctly capped Dewey's claim at three years' rent pursuant

to Section 502(b)(6) of the Bankruptcy Code. *See* Bankr. Decision at 46; 11 U.S.C. § 502(b)(6)

(providing that a claim for damages resulting from the termination of a lease of real property cannot

exceed the amount owed and due on the bankruptcy petition date, plus the "greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease.").

Belcrest's arguments to the contrary are unavailing. First, Belcrest argues that under the Amended Assignment Agreement between Dewey and New Town, Dewey assigned its right to rents to New Town starting on the Revenue Transfer Date of August 30, 2022, or approximately eleven months after Belcrest rejected the Lease on October 1, 2021. *See* Appellant's Br. at 44. According to Belcrest, Dewey's actual damages therefore consist of only eleven months of rent and should be capped at that amount; any claim damages from lost rent beyond the Revenue Transfer Date would properly belong to New Town rather than Dewey. *See id.* at 44-48. But the Amended Assignment Agreement between Dewey and New Town provided that Dewey would retain *all* rights to rents that "accrued" prior to the Revenue Transfer date—and because all of Belcrest's debts were immediately accelerated upon filing for Belcrest's bankruptcy petition on May 19, 2021, *see* 11 U.S.C. § 101(5), this would include all future rents pursuant to the Lease Agreement as of that date. Notably, Dewey and New Town—the actual parties to the Amended Assignment Agreement—are aligned in their understanding that, under the terms of the Amended Assignment Agreement, all claims for unpaid rent under the Lease Agreement properly belong to Dewey and not to New Town. *See* Bankr. Decision at 45-46.

Belcrest protests that the cases cited by the bankruptcy court did not involve leases for real property and that a landlord's claim must be capped at actual damages. *See* Appellant's Br. at 45. But those cases stand for the general proposition that *all* debts are immediately accelerated upon the filing of a bankruptcy petition. Belcrest cites no authority for the proposition that rents due under a lease should be treated any differently. Section 502(b)(6) of the Bankruptcy Code provides that damages from termination of a lease are capped at three years of rent; the bankruptcy court

correctly followed that rule here.[4]  Therefore, the claim amount is not limited to the rent accrued

for the 11 months before the Revenue Transfer date, as Belcrest claims.

## CONCLUSION

For the reasons given above, the judgment of the bankruptcy court is **AFFIRMED**.  The

Clerk of Court is respectfully directed to enter judgement consistent with this Opinion and Order

and to close the case.

SO ORDERED.

Dated:  June 4, 2025
       New York, New York

<br>

                                DALE E. HO
                         United States District Judge

---

[4] Because it affirms the bankruptcy court's ruling that Dewey properly had a claim for all rents under the Lease Agreement and that New Town did not, this Court does not address the Bankruptcy Court's alternative ruling that, if New Town did hold a claim to unpaid rent, it would be permitted to assert a late-filed claim.  *See* Bankr. Decision at 46.